UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


AUREUS HOLDINGS, LTD.
and DONALD SCHULTZ,

       Plaintiffs,

v.                                Case No. 03-75126

CITY OF DETROIT and             HONORABLE AVERN COHN
JAMES DOCKERY,

       Defendants.

_____/


**MEMORANDUM AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**I. Introduction.**

       This is a civil rights case under 28 U.S.C. § 1983 with pendant state law claims. Plaintiff Aureus Holdings Ltd. (Aureus) is a scrap metal processor doing business as Magnum Recycling Incorporated (Magnum).  Aureus operates a scrap yard in Detroit, Michigan (the Scrap Yard).  Plaintiff Donald Schultz (Schultz) worked at the Scrap Yard at different times for Aureus and non-party E&M Transportation, Inc. (E&M), a company that delivers metal to the Scrap Yard.

       Plaintiffs claim that Defendant James Dockery (Dockery), a Detroit Police Officer assigned to the Environmental Enforcement Section of the Detroit Police Department (DPD),[1] issued numerous citations against Aureus and Schultz without probable cause, and in other ways harassed plaintiffs, under a de facto policy approved by Defendant City of Detroit (City), thus depriving plaintiffs of numerous constitutional rights.

---

      [1] The DPD was initially a defendant in the case; the parties stipulated to its dismissal.

The claims are:

| | |
|---|---|
| Count 1: | violation of the Second and Fourteenth Amendment for illegally seizing a shotgun; |
| Count 2: | violation of the Fourth and Fourteenth Amendment for illegally seizing a shotgun; |
| Count 3: | malicious prosecution in violation of the Fourteenth Amendment by issuing citations without probable cause against each plaintiff to harass them; |
| Count 4: | tortious interference with a business relationship in violation of the Fourteenth Amendment for making criminal allegations against plaintiffs to frighten away customers, clients, and employees; |
| Count 5: | intentional infliction of emotional distress in violation of the Fourteenth Amendment through extensive harassment; |
| Count 6: | negligent infliction of emotional distress in violation of the Fourteenth Amendment through extensive harassment; |
| Count 7: | deprivation of a property interest without due process of law in violation of the Fourth, Fifth, and Fourteenth Amendments for revoking Aureus' business license, failing to renew the business license, all in contrary to the City Code. |

As the Court reads the complaint, not withstanding plaintiffs failure to differentiate, the parties to each claim are as follows:[2]

• Counts 1, 2, 3, 5, and 6: Schultz's claims against Dockery;

• Counts 3 and 4: Aureus' claims against Dockery.

• Count 7: Aureus' claim against the City.

Before the Court is Defendants' motion for summary judgment. At a March, 2006, hearing on the motion, the Court asked plaintiffs to submit supplemental papers setting forth the basic factual predicate for Count 3 (malicious prosecution and

_____

[2] At a hearing on the motion plaintiffs counsel concurred with the Court's reading of the complaint.

2

harassment) and Count 7 (deprivation of business license).  Plaintiffs have complied

with the request and the motion is ripe for decision.  For the following reasons, the

motion will be denied in part and granted in part.

## II. Background.

### A.

The chronology of events as best can be discerned from the parties' papers is as

follows.[3]

Aureus entered into an agreement with Consumers Scrap (Consumers) in early

2001 for the lease and purchase of the Scrap Yard and Magnum trade name.  Aureus

took control of operations under a lease in April, 2001.  Aureus began operating the

Scrap Yard without a license.[4]

Metal shavings are among the materials delivered to the Scrap Yard from

automobile manufacturers.  Metal shavings are coated with cutting oil.  Some oil drains

into the ground when the shavings are deposited at the Scrap Yard.

On May 17, 2001, Dockery came to the Scrap Yard where Schultz and Thomas

Pallisco (Pallisco), an Aureus employee, were working.  Dockery asked to see Aureus'

business license.  Aureus had never applied for a business license in its own name.

Pallisco was cited for operating the Scrap Yard without a business license, for failing to

have a certificate of occupancy, and for violations of state environmental laws because

oil was being dumped on the ground and draining into the public sewer system.

Plaintiffs say Pallisco was not served with the citations and copies of the citations were

_____

[3] Some of the events are uncertain due to the vagueness of the papers.

[4] Aureus says it operated under a "transferred license" from Consumers, but
does not point to any part of the City's code providing for a transfer.

3

not provided.[5]  Dockery advised Pallisco and Schultz to close the Scrap Yard.  That

same day, Aureus applied for a business license; the Department of Consumer Affairs

(DCA) instructed Aureus to stay closed pending approval of the license application.

On May 25, 2001, at about 7:00 a.m., with the license application still pending,

Schultz and James Behm (Behm) opened the Scrap Yard to prepare, plaintiffs say, for

an inspection as part of the application process.  Dockery and an unknown officer

arrived at the Scrap Yard soon thereafter.  Presumably Schultz, Behm, Dockery, and

the unknown officer discussed the activity at the Scrap Yard.  Dockery issued the

following citations: two to Schultz, for operating without a certificate of occupancy (#V-

508-853 and #V-508-856); one to Aureus, for the improper disposal of waste oil (#V-

508-881); and, to two to Behm, for unknown reasons (likely #V-508-854 and #V-508-

855).[6]  Schultz says Dockery threatened to arrest him and impound equipment on the

premises.  Schultz says the unknown officer indicated that it could appear that they

--------

[5] Plaintiffs say the citations were discovered during discovery.  The citations were dismissed on December 15, 2005, pursuant to a motion by Pallisco for failure to prosecute.

[6] Plaintiffs say Dockery issued four citations on this day.  But plaintiffs have provided copies of only three citations, and listed five citation numbers that likely were issued on this date given the chronological citation numbers.  These inconsistencies make it difficult for the Court to get a complete understanding of the facts.  Plaintiffs did provide a notice of hearing issued to Behm for a misdemeanor violation that occurred on May 25, 2001.

The Court understands that Dockery issued numerous citations against numerous entities and individuals on different days.  Adding to its confusion, however, is that no party provided the Court with a copy of each citation, or even a list of each citation, the date it was issued, who it was issued to, and the basis for the citation.  Plaintiffs list a total of 15 citations against Aureus, E&M, Magnum, Schultz, Marie Hallman, and Behm combined, but provided copies of 10 citations.  Plaintiffs say some of the citations were not immediately served, but do not say how or when each was subsequently discovered or whether the cited person/entity paid any fine for the unserved citations.

4

were operating the Scrap Yard, but agreed that they were not.

On or about June 6, 2001, Schultz says that while he waited for inspectors, about six DPD motorcycle officers parked in front of the Scrap Yard and revved their engines in a harassing manner for an unknown duration until Schultz left the Scrap Yard, thus missing the inspectors.  No document supports Schultz' assertion.

On June 16, 2001, Aureus received a license retroactive to April 1, 2001.[7]

On June 21, 2001, Schultz says about four DPD motorcycle officers stopped in front of the Scrap Yard, revved their engines, and turned their sirens on and off in a harassing manner for an unknown duration and then left.[8]  Schultz says he went home an hour early because he was agitated.  No document supports Schultz' assertion.

On or about July 17, 2001, Schultz says six DPD motorcycle officers and one police cruiser stopped in front of the Scrap Yard and revved their engines, and turned their sirens on and off in a harassing manner for an unknown duration.  Schultz says he felt agitated but stayed and finished the day.  No document supports Schultz' assertion.

On or about August 18, 2001,[9] Schultz says a marked DPD cruiser entered the Scrap Yard, chirped its siren and then left.  It is unknown how long the cruiser was in or around the Scrap Yard.  No document supports Schultz' assertion.

**B.**

On or about September 9, 2001, plaintiffs say Dockery issued two citations to Aureus for the illegal disposal of waste oil.  Plaintiffs say the citations were not served

---

[7] It appears that the license was issued retroactive to April 1 because the City license cycle begins on April 1 of each year.

[8] Plaintiffs provide no details of this activity.

[9] Schultz's written and unsworn statement says this event occurred on August 3, 2001, about two weeks earlier.  This inconsistency is of no significance.

5

and that there is no record of them. It is unknown when or how these citations were discovered.

On September 12, 2001, Dockery entered the office at the Scrap Yard and asked Schultz for the business license. A shotgun was in plain view in the office. Schultz showed Dockery the license, which was hanging on the wall. Schultz says Dockery asked him for identification and that he complied. Schultz says Dockery then demanded that he give him the shotgun.[10] Schultz says Dockery told him the shotgun was illegal and took it. Dockery says he asked Schultz who owned the shotgun and that Schultz said he did not know, so he took it. Dockery told Schultz he could get the shotgun back at the 11th Precinct. Schultz says Dockery issued three citations to him for: (1) the illegal disposal of waste oil, (2) the failure to present identification,[11] and (3) the improper disposal of anti-freeze.[12]

After Dockery left, Schultz called the State and City police in an attempt to get back the shotgun. Schultz was able to retrieve the shotgun that evening at the 11th Precinct. Schultz says he asked a police officer at the precinct to make a police report that Dockery had stolen the shotgun. Schultz says he was told a report would be filed; no report was filed.

On September 17, 2001, Aureus' attorney sent Dockery a letter telling Dockery to

---

[10] As the Court reads the papers, Schultz owns the shotgun.

[11] No party cites the law violated for failing to provide identification to Dockery.

[12] None of these citations were provided to the Court. Based on the ticket numbers and assuming the citations were issued in chronological order, plaintiffs' list has four citations that Dockery likely issued on this day (#V-509-567 through #V-509-570). Plaintiffs provided only one, #V-509-570, and that citation peculiarly is dated October 7, 2001. There is no explanation for this anomaly. This fourth citation is issued to Schultz for the illegal disposal of waste oil.

stop harassing the people and activity at the Scrap Yard.  The letter also stated that Dockery must have a search warrant to enter the Scrap Yard.

On September 26, 2001, Dockery issued the following citations: one each to "Marie Hellman" (#V-509-584) and Aureus (#V-509-585) for the illegal disposal of waste oil.  Marie Hallman, not Hellman, is the wife of an Aureus officer, but has never been to the Scrap Yard.  It is unclear when and how these citations were served on or discovered by plaintiffs, and whether Dockery visited the Scrap Yard on this day.

On or about October 1, 2001, Dockery cited "RM Transportation" (likely E&M) for the illegal disposal of waste oil at the Scrap Yard (V-509-604).[13]  It is unclear when and how the citation was served on or discovered by E&M, and whether Dockery visited the Scrap Yard on this day.

On or about October 4, 2001, Dockery cited Magnum for the illegal disposal of waste oil (V-509-622).  It is unclear when and how the citation was served on or discovered by Magnum, and whether Dockery visited the Scrap Yard on this day.

On or about October 5, 2001, Aureus says Dockery cited it for the illegal disposal of waste oil.  There is no record of this citation.

On or about October 7, 2001, Dockery cited Schultz for the illegal disposal of waste oil (V-509-570).  This citation is numerically close to the citations likely issued on September 12, 2001, and is discussed in footnote 12, supra.

On October 10, 2001, Aureus completed the purchase of the Scrap Yard from Consumers.  Aureus became the owner and operator of the Scrap Yard.

---

[13] This citation along with the following citations are listed in chronological order based on the date on each citation even though the corresponding citation numbers are not in numerical order.  Neither party mentions, let alone explains the reason for, this irregularity.

7

On or about October 16, 2001, Dockery blocked the entrance/exit to the Scrap Yard with his police cruiser. Dockery exited the cruiser and photographed the Scrap Yard. It is unclear how long Dockery was at the Scrap Yard. Schultz says Dockery's visit made him very agitated and he left work early. Before leaving, Dockery cited E&M (#V-509-601) and Magnum (#V-509-619) for the illegal disposal of waste oil. It is unclear when and how the citations were served on or discovered by E&M and Magnum.

On or about October 18, 2001, Dockery parked his police cruiser near the gate to the Scrap Yard, got out of the cruiser, and stood and watched the Scrap Yard for about an hour before leaving.

Plaintiffs say Dockery issued the following citations, but no document exists:

- November 19, 2001: one to Magnum for the illegal disposal of waste oil (it is unclear whether this citation was served or not);

- December 20, 2001: one each to Magnum, E&M, and Pallisco for the illegal disposal of waste oil (plaintiffs say these citations were never served and there is no record of them).

From May through December, 2001, plaintiffs say Dockery issued a total of 25 citations relating to the operations at the Scrap Yard; ten of the citations were issued to Aureus and/or Magnum, and six were issued to Schultz. No hearing took place in 2001, as all scheduled hearing dates on the citations were postponed.

Dockery issued no more citations. The following chart[14] sets forth all alleged citations. The Court was provided with copies of the citations that are in bold italics.

---

[14] The citations with unknown citations numbers, unknown recipients, unknown causes, and/or unknown service are included based on representations by plaintiffs.

8

**CITATIONS ISSUED BY DOCKERY.**

| DATE | CITATION # | RECIPIENT | CAUSE | SERVICE |
|------|-----------|-----------|-------|---------|
| May 17, 2001 | Unknown | Pallisco | no license | No |
| May 17, 2001 | Unknown | Pallisco | no certificate of occupancy | No |
| May 17, 2001 | Unknown | Pallisco | oil dumping | No |
| May 25, 2001 | *V-508-853* | Schultz | no certificate of occupancy | yes |
| May 25, 2001 | V-508-854 | Behm | unknown–no copy of the citation | unknown |
| May 25, 2001 | V-508-855 | Behm | unknown–no copy of the citation | unknown |
| May 25, 2001 | *V-508-856* | Schultz | no certificate of occupancy | yes |
| May 25, 2001 | *V-508-881* | Aureus | oil dumping | yes |
| Sept. 9, 2001 | unknown | Aureus | oil dumping | no |
| Sept. 9, 2001 | unknown | Aureus | oil dumping | no |
| Sept. 12, 2001 | V-509-567 | unknown | unclear–plaintiffs fail to specify | yes |
| Sept. 12, 2001 | V-509-568 | unknown | unclear–plaintiffs fail to specify | yes |
| Sept. 12, 2001 | V-509-569 | unknown | unclear–plaintiffs fail to specify | yes |
| Sept. 12, 2001 | *V-509-570* | Schultz | oil dumping–see Oct. 7, 2001 | yes |
| Sept. 26, 2001 | *V-509-584* | Hellman | oil dumping | unknown |
| Sept. 26, 2001 | *V-509-585* | Aureus | oil dumping | unknown |
| Oct. 1, 2001 | *V-509-604* | E&M | oil dumping | unknown |
| Oct. 4, 2001 | *V-509-622* | Magnum | oil dumping | unknown |
| Oct. 5, 2001 | unknown | Aureus | oil dumping | unknown |
| Oct. 7, 2001 | *V-509-570* | Schultz | oil dumping–see Sept. 12, 2001 | yes |
| Oct. 16, 2001 | *V-509-601* | E&M | oil dumping–citation out of order | yes |
| Oct. 16, 2001 | *V-509-619* | Magnum | oil dumping–citation out of order | yes |
| Nov. 19, 2001 | unknown | Magnum | oil dumping | unknown |
| Dec. 20, 2001 | unknown | Magnum | oil dumping | no |
| Dec. 20, 2001 | unknown | E&M | oil dumping | no |
| Dec. 20, 2001 | unknown | Pallisco | oil dumping | no |

**C.**

In January, 2002, Aureus hired a consultant to test the Scrap Yard's pollution conditions. The consultant concluded that Aureus was compliant with state oil disposal requirements because the oil at the Scrap Yard was not petroleum-based.

On February 19, 2002, Aureus' counsel, Dockery, and a representative of the City and Wayne County prosecutors' offices met to resolve the citations[15] under the supervision of a 36th District Court judge.[16] Aureus denied liability on the environmental citations and offered the consultant's test results as evidence that the oil on the metal shavings was environmentally sound and not petroleum based. Dockery had no test results supporting the citations. To resolve the citations, Aureus agreed to install two underground storage tanks at the Scrap Yard to capture the lubricants. The City agreed. Dockery was aware of this resolution.

In April, 2002, Aureus leased the Scrap Yard to TC Associates for a five year term, but retained the right to operate out of the yard during the lease.[17] Also in April, 2002, Aureus renewed its license for the Scrap Yard in 2002.

**D.**

In September, 2002, the Michigan Department of Environmental Quality (MDEQ) and the Detroit Water and Sewerage Department (DWSD) received an anonymous tip

---

[15] It is unclear whether all of just the environmental citations were considered at the meeting.

[16] It is unclear whether this meeting was a settlement conference or a formal judicial proceeding. It is unclear whether any formal judicial proceedings ever took place on the citations before their dismissal.

[17] Under the lease, TC Associates operated the consumer side of the business and Aureus operated the commercial side. Aureus and TC Associates shared office space and the surrounding grounds.

that illegal dumping of fluids was occurring at the Scrap Yard and began investigating. Plaintiffs say Dockery was the source of the tip.

In November, 2002, the MDEQ and the DWSD conducted a joint visit to the Scrap Yard.

On or about December, 13, 2002, the MDEQ sent a 10-page Letter of Warning to Aureus, Magnum, and E&M.  The letter enumerated 14 complaints of possible wrong-doing.

**E.**

On December 17, 2002, Aureus contracted to install the storage tanks pursuant to the settlement negotiated at the February, 2002, meeting at the 36th District Court. The storage tanks cost more than $100,000.

On December 20, 2002, Dockery and John Fuqua (Fuqua), a DCA representative, came to the Scrap Yard office.  It is unclear what employees were at the Scrap Yard.  Fuqua asked to see Aureus' license, which was hanging on the wall. Aureus says Fuqua pulled the license from the wall, took it, and left.  Dockery was present during this exchange, but denied any connection to Fuqua's visit.  It appears Aureus ceased operating the Scrap Yard after Fuqua and Dockery left.

Over the next month following Fuqua's visit, Aureus' counsel left numerous messages and sent numerous letters to Gwendolyn Lett (Lett), a DCA supervisor, to determine why Fuqua had taken the license.  Aureus also sent letters to the Director of Building and Safety Engineering and the Mayor of the City.  Lett initially reported that the DCA had erred in issuing the license because the "Crimes Against Property" (CAP) approval had not been received.  Aureus says CAP approval had not been a concern when the license was renewed in April, 2002.  Aureus says Lett reported that Dockery

and Fuqua contributed to the decision to take the license.

On January 17, 2003, Lett returned the license to Aureus.

In March, 2003, Aureus applied to renew the license.  On March 31, 2003, a City building inspector reported that the Scrap Yard required numerous corrections to pass inspection.  Aureus disputed the inspector's report.  In April, 2003, Aureus twice requested an "office hearing" or re-inspection in accordance with City regulations to contest the report.  No hearing or re-inspection occurred.

In May, 2003, Aureus sent a letter to Lett requesting a hearing, or that the license be renewed. The current status of the license is unresolved.

On November 6, 2003, the 36th District Court certified that the storage tanks had been installed, and dismissed nine of the citations.  It is unclear which citations were dismissed.[18]  Satisfied by the measures Aureus had taken, the MDEQ closed its investigation on November 18, 2003.

On December 22, 2003, Aureus and Schultz filed suit.

### III. Discussion.

### A. Legal Standard.

Summary judgment will be granted when the moving party demonstrates that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).  There is no genuine issue of material fact when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

---

[18] It is also unclear what happened to the citations that were not dismissed, or whether any citations resulted in fines.

12

The nonmoving party may not rest upon his pleadings; rather, the nonmoving party's response "must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e).  Showing that there is some metaphysical doubt as to the material facts is not enough; "the mere existence of a scintilla of evidence" in support of the nonmoving party is not sufficient to show a genuine issue of material fact.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).  Rather, the nonmoving party must present "significant probative evidence" in support of its opposition to the motion for summary judgment in order to defeat the motion.  See Moore v. Philip Morris Co., 8 F.3d 335, 340 (6th Cir. 1993); see also Anderson, 477 U.S. at 249-50.  Additionally, and significantly, "affidavits containing mere conclusions have no probative value" in summary judgment proceedings.  Bsharah v. Eltra Corp., 394 F.2d 502, 503 (6th Cir. 1968).

The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law." In re Dollar Corp., 25 F.3d 1320, 1323 (6th Cir. 1994) (quoting Anderson, 477 U.S. at 251-52).  The Court "must view the evidence in the light most favorable to the non-moving party."  Employers Ins. of Wausau v. Petroleum Specialties, Inc., 69 F.3d 98, 101 (6th Cir. 1995).  Determining credibility, weighing evidence, and drawing reasonable inferences are left to the trier of fact.  See Anderson, 477 U.S. at 255.  Only where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law may summary judgment be granted.  Thompson v. Ashe, 250 F.3d 399, 405 (6th Cir. 2001).

13

## B. Analysis.

### 1. Introduction.

#### a.

To succeed under 42 U.S.C. § 1983 a plaintiff is required to show: (1) that he was deprived of a right secured by the Constitution or laws of the United States; and (2) the deprivation was caused by someone acting under color of state law.  Perry v. McGinnis, 209 F.3d 597, 603 (6th Cir. 2000).  State law tort claims find their support in the common law.

#### b.

The City makes the following arguments in support of summary judgment on Count 7:[19] (1) Aureus cannot establish the existence of a municipal custom, policy or practice; and (2) Aureus does not have a protected property right to a business license under the due process clause of the Fourteenth Amendment.

#### c.

Dockery makes the following arguments in favor of summary judgment on Counts 1 through 6: (1) Schultz's state tort law claims (Counts 3 through 6) can not be asserted under the federal Constitution; (2) Schultz has no individual right of action under the Second Amendment; and (3) Dockery is entitled to qualified immunity on Count 2.[20]

---

[19] As the Court reads the complaint, Count 7 contains two procedural due process claims by Aureus against the City: (1) for the seizing of the license, and (2) for the failure to renew the license.  Though unstated, the Court presumes that a business must display a license to operate.

[20] Given the confused nature of the complaint, the Court has restated Aureus and Schultz's claims in a cohesive fashion as will be seen.

14

## 2.  The City: the Presence of a Municipal Custom.

### a.  Introduction.

Despite Aureus' attempt to implicate the City in all counts, Count 7 is the only claim against the City.  Aureus says the City was deliberately indifferent to the conduct of its employees who revoked the license and failed to renew Aureus' license without due process.

A political subdivision is liable under § 1983 if its official policies or informal customs cause a constitutional violation.  Heflin v. Stewart County, Tennessee, 958 F.2d 709, 716 (6th Cir. 1992).  To state a claim against a municipality, a plaintiff must show that the municipality, through custom or policy, caused the alleged constitutional violation.  Monell v. Dept. of Social Services, 436 U.S. 658 (1978).  A municipality cannot be vicariously liable under § 1983 for a constitutional violation caused by an employee or agent.  Monell, 436 U.S. at 694.  Rather, a local government can be liable only when a government action is "so permanent and well settled as to constitute a custom or usage with the force of law," Davenport v. Simmons, 192 F. Supp. 2d 812, 824 (W.D. Tenn. 2001), or when the government's official policy is the "moving force of the constitutional violation."  Monell, 436 U.S. at 694.  See also Pembaur v. City of Cincinnati, 475 U.S. 469 ("municipal liability under § 1983 attaches where–and only where–a deliberate choice to follow a course of action is made from among various alternatives. . .").

### b.  Discussion.

Aureus says the revocation of the license constituted an illegal seizure in violation of procedural due process.  Aureus says the license revocation occurred without Fuqua or Dockery having probable cause or following the City Code's revocation

15

procedures, which require a hearing.  Aureus says Lett, as a DCA supervisor, instructed Fuqua to take the license contrary to the Code and without notice.  Aureus says it contacted the highest levels of City government seeking the return of the license, meaning the City implemented an official policy in seizing the license.

Aureus also says the City and the DCA subsequently refused to renew the license, re-inspect the Scrap Yard, schedule a hearing, or otherwise follow the Code's procedures governing license applications.  Plaintiffs say the City has not sustained its burden of demonstrating that there are no material issues of fact as to whether the City, through the DCA, was deliberately indifferent to the proscribed procedures when it failed to renew the license.

### c.  Resolution.

Aureus says its procedural due process right to the license was violated when Dockery, Fuqua, Lett, and perhaps others, took the license, and then, after returning it, failed to renew it, all in contravention of the Code.  In so stating, Aureus contradicts the very assertion it is trying to make.  On one hand, Aureus says the City created a policy that violated its constitutional rights.  On the other hand, Aureus say the City failed to follow its own license revocation and renewal policies, which Aureus admits are constitutional.  What Aureus disputes is Dockery, Fuqua, Lett, and perhaps others' failure to follow the policy.  However Aureus presents no evidence that any City official capable of creating policy had any knowledge of Dockery, Fuqua, or Lett's revocation of the license.  Aureus instead simple asserts a "de facto" official policy or custom from the circumstances.  There is no evidence of a pattern of similar activity.  In cases where no official policy exists, Aureus' remedy is to sue the individuals who violated its

16

constitutional rights, not the City.[21]

### 3.  The City:  Aureus' Property or Liberty Interest in the License.

In addition to the City's challenge to Aureus' claim that the City had an official policy that violated the Constitution, thus giving rise to municipal liability, the City says Aureus' procedural due process claim against the City for taking and failing to renew the license must be dismissed because Aureus lacks a protected property or liberty interest in the license.  Due to the lack of a municipal policy, as discussed above, the City cannot be held liable for Count 7 even if a protected property or liberty interest exists.  It is unnecessary, therefore, to decide whether Aureus has a property or liberty interest in the license protected by procedural due process

### 4. Dockery: State Tort Claims As a Basis for § 1983 relief.

As pled, Counts 3, 4, 5, and 6 are state common law tort claims against Dockery that Aureus or Schultz, depending on the count, say rise to a constitutional violation under the Fourteenth Amendment.  Section 1983 only provides a mechanism to seek redress for rights arising under the federal Constitution, and does not create a federal right of action under the Fourteenth Amendment for every violation of state tort law. Paul v. Davis, 424 U.S. 693, 701 (1976).  Thus, as pled, the claims do not set forth constitutional violations.

Instead, the Court reads these counts in two ways: (1) as pendent state law claims; and (2) taken together as an equal protection violation under the Fourteenth

---

[21] The only evidence of Dockery's involvement in the license revocation was his accompanying Fuqua to the Scrap Yard to seize the license.  Dockery only carried out a police function and, as plaintiff's counsel admitted at the March, 2006, hearing, cannot be liable in such circumstances.

17

Amendment.[22]  The Court reads these counts both ways, meaning plaintiff has asserted

pendant state law claims, and overall a claim that Dockery violated Aureus and

Schultz's equal protection rights in the manner in which he harassed them.

The parties did not dispute the common law claims.  The malicious prosecution,[23]

tortious interference,[24] intentional infliction of emotional distress,[25] and negligent

infliction of emotional distress,[26] claims stand.

As for the overall reading, the conduct described in these counts assert a

violation of Aureus and/or Schultz's equal protection rights.[27]

---

[22] A substantive due process violation is an alternative reading.  The Court
believes, however, that an equal protection claim is better suited to the facts.

[23] The elements of a malicious prosecution claim are:  (1) prior proceedings
terminated in favor of the present plaintiff, (2) the absence of probable cause for the
prior proceedings, (3) malice, which is defined as a purpose other than to secure the
proper adjudication of the claim, and (4) a special injury flowing directly from the prior
proceedings.  Friedman v. Dozorc, 412 Mich. 1, 48 (1981).

[24] The elements of a tortious interference claim are: (1) the existence of a valid
business relationship or expectancy, (2) knowledge of the relationship or expectancy by
the interferer, (3) an intentional and wrongful interference inducing or causing a breach
or termination of the relationship or expectancy, and (4) resultant damage to the party
whose relationship or expectancy was disrupted.  Badiee v. Brighton Area Schools, 265
Mich. App. 343, 365-366 (2005).

[25] The elements of an intentional infliction of emotional distress claim are: (1)
extreme and outrageous conduct; (2) intent or recklessness; (3) causation; and (4)
severe emotional distress. Lewis v. LeGrow, 258 Mich.App 175, 196 (2003).

[26] The elements of a negligent infliction of emotional distress claim are:  (1)
serious injury threatened or inflicted on a person, not the plaintiff, of a nature to cause
severe mental disturbance to the plaintiff, (2) shock by the plaintiff from witnessing the
event that results in the plaintiff's actual physical harm, (3) close relationship between
the plaintiff and the injured person (parent, child, husband, or wife), and (4) presence of
the plaintiff at the location of the accident at the time the accident occurred or, if not
present, at least shock "fairly contemporaneous" with the accident.  Hesse v. Ashland
Oil, Inc., 466 Mich. 21, 34 (2002).

[27] The United States Supreme Court has upheld the "class of one" principle for
equal protection claims by a citizen alleging unequal treatment by a state actor.  Village

Just because Aureus and Schultz inappropriately pled Counts 3 through 6 as state tort law claims that generically violate the Fourteenth Amendment does not mean the conduct alleged does rise to a § 1983 violation. Discussing the "§ 1983 malicious prosecution claim" terminology in Albright v. Oliver, 510 U.S. 266 (1994), a treatise states:

> Finally, it is worth noting that the Supreme Court, unlike some of the circuits dealing with § 1983 malicious prosecution actions and confused by the tort-like terminology, wisely did not lose sight of what was really at stake in Albright: was there a constitutional violation alleged? All of the opinions [in Albright] properly focused on this question and were not led astray by the characterization of the plaintiff's claim as a § 1983 malicious prosecution claim. That is, their analysis was not determined by tort principles but rather by constitutional principles, which should always be the case...."

Sheldon Nahmod, Civil Rights and Civil Liberties Litigation, 4th ed. § 3:65.

Dockery's motion for summary judgment on Counts 3 through 6 is denied without prejudice. Dockery may renew his motion for summary judgment on the state law tort claims and the equal protection claim, including the issue of qualified immunity.

### 5. Dockery: Individual Rights of Action Arising Under the Second Amendment.

Dockery says Count 1 must be dismissed because the Second Amendment, guaranteeing "the right of the people to keep and bear Arms," does not create a private remedy in individuals who claim to have lost the ability to have a firearm. U.S. v. Warin, 530 F.2d 103, 106 (6th Cir. 1976) (creating the "collective rights" model). Consequently, constitutional claims relying on the Second Amendment under § 1983, Dockery says, must be dismissed. Pencak v. Concealed Weapon Licensing Bd., 872 F. Supp. 410

---

of Willowbrook v. Olech, 528 U.S. 562 (2000). See also Nicole Richter, Note, A Standard for "Class of One" Claims Under the Equal Protection Clause of the Fourteenth Amendment: Protecting Victims of Non-Class Based Discrimination from Vindictive State Action, 35 Val. U. L. Rev. 197 (2000-2001).

19

(E.D. Mich. 1994).

Plaintiffs respond that the Fifth Circuit has held that the Second Amendment does confer an individual actionable right.  United States v. Emerson, 270 F.3d 203 (5th Cir. 2001).  This Court must follow the Sixth Circuit rule.  Dockery's motion for summary judgment is GRANTED and Count 1 is DISMISSED.

### 6.  Qualified Immunity.

### a.  Legal Standard.

Dockery asserts the defense of qualified immunity.  This defense applies only to Count 2 for the illegal search and seizure of the shotgun.

A government official may be protected from liability for his or her actions by qualified immunity.  Qualified immunity is determined under a two-part test.  The first inquiry is whether the facts show the officers' conduct violated a constitutional right.  If no right is violated, the inquiry ends.  If a violation is found, the second inquiry is whether the constitutional right was clearly established in light of the specific context of the case.  Saucier v. Katz, 533 U.S. 194, 202 (2001).  Qualified immunity arises out of a government official's performance of discretionary acts when their acts do not "violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Greene v. Barber, 310 F.3d 889, 894 (6th Cir. 2002).

### b.  Discussion.

Dockery says he did not violate a clearly established constitutional right[28] when he took the shotgun.  Dockery says he took the shotgun only after Schultz disavowed ownership of it, leading Dockery to believe the gun was unprotected.   In these

---

[28] It is unclear whether Dockery is saying that he did not violate a constitutional right, or that the right was not clearly established.

20

circumstances, Dockery says he had probable cause to take the shotgun.

Schultz says "probable cause means something less than evidence that would justify...conviction, but more than bare suspicion."  Greene v. Reeves, 80 F3d 1101, 1105 (6th Cir. 1996) (internal citations omitted).  Schultz says Dockery seized his legally-owned shotgun without a warrant and without probable cause, and the City's return of the shotgun later that day acknowledged this fact, despite Dockery's statement that the gun was illegal.

Dockery says the fact that the gun was returned later the same day means the seizure claim is de minimus.

### c.  Resolution.

Schultz and Dockery describe remarkably different versions of events surrounding the seizure of the shotgun.  Seizing a weapon without probable cause is a constitutional violation.  Whether Dockery violated a clearly established constitutional right turns on whose version of events is deemed credible.  The Court cannot make such a credibility determination.  Summary judgment on the issue of qualified immunity as to Count 2 is DENIED.

### C. Conclusion.

For the reasons stated above, all claims against the City and Count 1 against Dockery are DISMISSED.  The following parties and claims remain:

• 	Count 2, Schultz's § 1983 claim that Dockery illegally seized the shotgun;

• 	Count 3, Schultz and Aureus' claim against Dockery for malicious prosecution;

• 	Count 4, Aureus' claim against Dockery for tortious interference with its business;

• 	Count 5, Schultz's claim against Dockery for intentional infliction of emotional distress;

21

• Count 6, Schultz's claim against Dockery for negligent infliction of emotional distress; and,

• Aureus and Schultz's § 1983 claim against Dockery for unequal treatment regarding the conduct described in Counts 3 through 6.

SO ORDERED.


  s/Avern Cohn                                  
AVERN COHN
UNITED STATES DISTRICT JUDGE

Dated:  June 1, 2006


I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, June 1, 2006, by electronic and/or ordinary mail.


  s/Julie Owens                                 
Case Manager
(313) 234-5160